**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

ALBERT CLATTERBUCK; CHRISTOPHER
MARTIN; EARL MCCRAW; JOHN
JORDAN; MICHAEL SLOAN,

        *Plaintiffs-Appellants,*

        v.

CITY OF CHARLOTTESVILLE,

        *Defendant-Appellee.*

No. 12-1149

THE THOMAS JEFFERSON CENTER FOR
THE PROTECTION OF FREE
EXPRESSION,

    *Amicus Supporting Appellants.*

ALBERT CLATTERBUCK; CHRISTOPHER
MARTIN; EARL MCCRAW; JOHN
JORDAN; MICHAEL SLOAN,

                *Plaintiffs-Appellees,*

                    v.

CITY OF CHARLOTTESVILLE,

                *Defendant-Appellant.*

                                            No. 12-1215

THE THOMAS JEFFERSON CENTER FOR
THE PROTECTION OF FREE
EXPRESSION,

        *Amicus Supporting Appellees.*

Appeals from the United States District Court
for the Western District of Virginia, at Charlottesville.
Norman K. Moon, Senior District Judge.
(3:11-cv-00043-NKM-BWC)

Argued: December 5, 2012

Decided: February 21, 2013

Before DUNCAN, AGEE, and DAVIS, Circuit Judges.

Reversed and remanded by published opinion. Judge Duncan
wrote the opinion, in which Judge Agee and Judge Davis
joined.

**COUNSEL**

**ARGUED:** Jeffrey Edward Fogel, Charlottesville, Virginia, for Appellants/Cross-Appellees. Richard Hustis Milnor, TAYLOR ZUNKA MILNOR & CARTER, LTD., Charlottesville, Virginia, for Appellee/Cross-Appellant. **ON BRIEF:** Steven D. Rosenfield, ACLU OF VIRGINIA, Charlottesville, Virginia; Rebecca K. Glenberg, Thomas O. Fitzpatrick, AMERICAN CIVIL LIBERTIES UNION OF VIRGINIA FOUNDATION, INC., Richmond, Virginia, for Appellants/Cross-Appellees. J. Joshua Wheeler, Clayton N. Hansen, THE THOMAS JEFFERSON CENTER FOR THE PROTECTION OF FREE EXPRESSION, Charlottesville, Virginia, for Amicus Supporting Appellants/Cross-Appellees.

---

**OPINION**

DUNCAN, Circuit Judge:

This case presents the question of whether a municipal ordinance, which prohibits individuals from soliciting immediate donations near two streets that run through the Downtown Mall in Charlottesville, Virginia, unconstitutionally restricts the free speech of individuals who regularly beg on the Downtown Mall. We hold that the district court erred by resolving this issue at the pleadings stage, and reverse and remand for further proceedings.

I.

A.

The City of Charlottesville (the "City") has adopted an ordinance that proscribes "soliciting" in certain areas of the

City. Section 28-31 of the Charlottesville City Code (the "Ordinance") reads in relevant part[1] as follows:

> (a) It shall be unlawful for any person to solicit money or other things of value, or to solicit the sale of goods or services:
>
> . . .
>
> > (9) On the Downtown Mall within fifty (50) feet (in any direction) of 2nd Street West and 4th Street East, when those streets are open to vehicular traffic.
>
> . . .
>
> *Solicit* means to request an immediate donation of money or other thing of value from another person, regardless of the solicitor's purpose or intended use of the money or other thing of value. A solicitation may take the form of, without limitation, the spoken, written, or printed word, or by other means of communication (for example: an outstretched hand, an extended cup or hat, etc.).
>
> (c) Any person violating the provisions of this section shall be guilty of a Class 3 misdemeanor.

Charlottesville City Code, § 28-31 (as amended Aug. 16, 2010); J.A. 14.

Albert Clatterbuck, Christopher Martin, Earl McCraw, John Jordan, and Michael Sloan (collectively, "Appellants") are "impecunious and reliant to a certain extent on begging to

---

[1]Although Appellants initially challenged several provisions of the Ordinance, they limit their argument on appeal to a facial challenge of subsection (a)(9).

sustain [themselves.]" J.A. 7. One of the locations where each Appellant begs is "East Main Street in the City, commonly known as the Downtown Mall." *Id.* The complaint alleges few facts about the Downtown Mall, other than that it "has numerous restaurants and cafes with outdoor seating, and [Appellants] regularly beg within view of those restaurants and cafes." *Id.*

## B.

Appellants brought this action under 42 U.S.C. § 1983 against the City to challenge the constitutionality of the Ordinance, asserting that it violates their First Amendment right to beg, impermissibly restraining their protected speech activities and livelihood. The complaint alleges that the City adopted the Ordinance "in order to restrict the right of the impoverished to solicit funds for their own well-being," and challenges the Ordinance as a content-based regulation that criminalizes speech based on the content of the communication. J.A. 9. Further, the complaint states that "[a]s a direct and proximate result of the conduct of [the City] in enacting the ordinance, [Appellants] have and will continue to suffer harm, including, but not limited to damages to the right to communicate to the general public as well as emotional distress." *Id.* at 9-10. Appellants seek declaratory and injunctive relief, damages, and attorneys' fees and costs.

The City filed a motion to dismiss the action for lack of standing and for failure to state a claim pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), respectively. The district court found Appellants had standing, but dismissed the action for failing to allege a cognizable First Amendment violation. The court reasoned that the Ordinance constitutes a content-neutral, permissible time, place, and manner restriction. Appellants timely appealed the district court's decision to dismiss the action, and the City cross-appealed to challenge the district court's determination that Appellants have standing to bring their claim.

## II.

We first address the City's argument that Appellants do not have standing to bring this First Amendment challenge to the Ordinance. Finding that they do, we next turn to Appellants' claim itself, and conclude that it was improperly dismissed at the pleadings stage.

## A.

The threshold issue of standing is a legal question that we examine de novo. *See Benham v. City of Charlotte*, 635 F.3d 129, 134 (4th Cir. 2011). As the party asserting federal jurisdiction, Appellants bear the burden of establishing they have standing to invoke the authority of a federal court—a burden which tracks the manner and degree of evidence required at each successive stage of litigation. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Accordingly, at the present pre-discovery pleadings stage, "general factual allegations of injury resulting from the [City's] conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Id.* (internal quotation marks and alterations omitted); *see also Bishop v. Bartlett*, 575 F.3d 419, 424 (4th Cir. 2009).

In order to possess standing to bring this action in federal court, Appellants must show the three familiar elements of constitutional standing: injury-in-fact, causation, and redressability. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). The essence of the standing inquiry is whether the party seeking to invoke federal jurisdiction has "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Baker v. Carr*, 369 U.S. 186, 204 (1962). We agree with the district court that Appellants have done so here for the purposes of the motion to dismiss.

As a preliminary matter, we note that the speech and expressive conduct that comprise begging merit First Amendment protection. The Supreme Court has held that the solicitation of "charitable contributions" is protected speech. *Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 789 (1988). Several of our sister circuits have extended that holding to begging, which is simply solicitation on behalf of the speaker. *See, e.g.*, *Smith v. City of Fort Lauderdale*, 177 F.3d 954, 956 (11th Cir. 1999) ("Like other charitable solicitation, begging is speech entitled to First Amendment protection."); *Loper v. New York City Police Dep't*, 999 F.2d 699, 704 (2d Cir. 1993) ("We see little difference between those who solicit for organized charities and those who solicit for themselves in regard to the message conveyed. The former are communicating the needs of others while the latter are communicating their personal needs. Both solicit the charity of others. The distinction is not significant for First Amendment purposes."). We agree that begging is communicative activity within the protection of the First Amendment.

The City argues on cross-appeal that Appellants lack standing because they failed to allege that they have begged in the past, or wish to beg in the future, specifically within the two fifty-foot "buffer zones" when those streets are open to vehicular traffic, as prohibited by the Ordinance. According to the City, this lack of specificity prevents us from knowing whether Appellants are actually harmed by subsection (a)(9) of the Ordinance—i.e., whether they can establish an injury-in-fact for standing purposes. Because we find Appellants have pleaded sufficiently specific facts to demonstrate they have suffered "an invasion of a legally protected interest," *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 460 (4th Cir. 2005) (internal quotation marks omitted), that is "concrete and particularized" and "actual or imminent," rather than "conjectural or hypothetical," *Lujan*, 504 U.S. at 560 (internal quotation marks omitted), we disagree.

Although the complaint does not allege that Appellants have begged or plan to beg specifically within the fifty-foot

buffer zones, it does, more generally, allege that Appellants regularly beg on the Downtown Mall, and that they suffer harm by being prevented from fully exercising their First Amendment rights. These "general factual allegations . . . may suffice . . . on a motion to dismiss [to allow us to] presume that [they] embrace those specific facts that are necessary to support the claim." *Id.* at 561 (internal quotation marks omitted). We decline the City's invitation to rigidly impose such a precise level of specificity at the pleadings stage.

The Ordinance, which prohibits solicitation within a subsection of the Mall, actually and concretely impacts Appellants' general begging activities on the Mall as described in their complaint. Indeed, the Ordinance may constitute a cognizable injury to Appellants merely by interfering with or creating the "'need[ ] to plan the substance and placement of'" their speech. *Benham*, 635 F.3d at 135 (quoting *Va. Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379, 389 (4th Cir. 2001)). Further, the Ordinance limits not only the area available for Appellants' speech activities, but also the audience. "A regulation that reduces the size of a speaker's audience can constitute an invasion of a legally protected interest." *White Tail Park*, 413 F.3d at 461.

For these reasons, we find Appellants' allegations substantiate their standing[2] to bring this constitutional challenge. Even without specifically alleging they have begged within the buffer zones, Appellants' allegations that the Ordinance restricts and deters their begging activity on the Mall form the basis for a cognizable injury under the First Amendment at this juncture.

---

[2]The City does not challenge the sufficiency of Appellants' allegations as to the second and third prongs of the standing inquiry—causation and redressability. Finding these prongs satisfied, we omit discussion of them.

B.

We turn next to examine whether Appellants' claim that the Ordinance violates the First Amendment was adequately pleaded in their complaint. We review the district court's dismissal of Appellants' claim de novo, accepting as true the facts alleged in the complaint. *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 364-65 (4th Cir. 2012); *Aziz v. Alcolac, Inc.*, 658 F.3d 388, 391 (4th Cir. 2011). To survive a Rule 12(b)(6) motion to dismiss, a complaint must establish "facial plausibility" by pleading "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "At bottom, a plaintiff must 'nudge[ ] [its] claims across the line from conceivable to plausible' to resist dismissal." *Wag More Dogs*, 680 F.3d at 365 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

1.

Before determining the sufficiency of Appellants' allegations, we must first ascertain the appropriate First Amendment framework to apply to their claim.

We start with the relatively uncontroversial premise that begging on the Downtown Mall constitutes expressive activity in a traditional public forum, which garners the full protective force of the First Amendment. We then examine the type of restriction imposed by the Ordinance, and find that the proper standard cannot be determined, or applied, at this stage of the proceedings.

a.

We have already explained that begging constitutes protected speech. Additionally, by restricting speech near streets on the Downtown Mall, the Ordinance regulates a quintessen-

tial public forum over which the First Amendment's shield is strongest.

"In places which by long tradition or governmental fiat have been devoted to assembly and debate, the rights of the state to limit expressive activity are sharply circumscribed." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). Although there is very little information about the Downtown Mall in the record, places such as parks, streets, and sidewalks fall into "the category of public property traditionally held open to the public for expressive activity." *Loper*, 999 F.2d at 704; *see also Smith*, 177 F.3d at 956; *ISKON of Potomac, Inc. v. Kennedy*, 61 F.3d 949, 954 (D.C. Cir. 1995) (Mall in Washington, D.C. constitutes a traditional public forum). Indeed, the Supreme Court has repeatedly referred to public streets and sidewalks as "'the archetype of a traditional public forum.'" *Snyder v. Phelps*, ___ U.S. ___, 131 S.Ct. 1207, 1218 (2011) (quoting *Frisby v. Schultz*, 487 U.S. 474, 480 (1988)). With this strength of authority, and without any indication to the contrary, we conclude that the Downtown Mall constitutes a traditional public forum.

Because Appellants seek to engage in protected speech in a traditional public forum, the government's power to regulate that speech is limited, though not foreclosed. The government may impose reasonable content-neutral time, place, and manner restrictions that are narrowly tailored to serve a significant government interest and leave open ample alternative channels of communication. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). If the regulation is content-based, however, we apply strict scrutiny. *Perry*, 460 U.S. at 45. Under that heightened standard, we may uphold the regulation only if it is the least restrictive means available to further a compelling government interest. *Id.* Thus, our final step in establishing the appropriate First Amendment framework requires us to determine whether the Ordinance is content-based or content-neutral. *See Schultz*, 487 U.S. at 481 ("[T]he appropriate level of scrutiny is initially tied to whether the statute

distinguishes between prohibited and permitted speech on the basis of content."). We turn to this inquiry next.

b.

The government's restriction of speech is content-neutral if it is "'justified without reference to the content . . . of the regulated speech.'" *Christian Legal Soc'y v. Martinez*, ___ U.S. ___, 130 S.Ct. 2971, 2994 (2010) (quoting *Ward*, 491 U.S. at 791). On the other hand, a restriction is content-based if it was "adopted . . . because of disagreement with the message [the speech] conveys." *Ward*, 491 U.S. at 791. In this inquiry, "[t]he government's purpose is the controlling consideration." *Id.*

In evaluating challenges to municipal sign ordinances, we have adopted a pragmatic rather than formalistic approach to evaluating content neutrality. *See Wag More Dogs*, 680 F.3d at 366; *Brown v. Town of Cary*, ___ F.3d ___, 2013 WL 221978, slip op. at 11-13 (4th Cir. Jan. 22, 2013). Under this practical analysis, not every content distinction merits strict scrutiny; instead, a distinction is only content-based if it distinguishes content "with a censorial intent to value some forms of speech over others to distort public debate, to restrict expression because of its message, its ideas, its subject matter, or to prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Brown*, slip op. at 11 (internal citations and alterations omitted).

In deciphering censorial intent, *Brown* looked to the "relationship—or lack thereof—between the content distinction and the legislative end." *Id.* at 14. In so doing, we have examined whether the government's content-neutral justification reasonably comports with the content distinction on the face of the regulation. *See Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642-43 (1994) ("[T]he mere assertion of a content-neutral purpose [is not] enough to save a law which, on its face, discriminates based on content.").

Here, the district court concluded that the Ordinance is content-neutral because it "does not distinguish between favored and disfavored solicitation," *Clatterbuck v. City of Charlottesville*, 841 F. Supp. 2d 943, 953 (W.D. Va. 2012), but rather "applies to all forms of solicitations, regardless of the solicitor's purpose or the content of the solicitor's speech," *id.* at 950. We cannot agree. The Ordinance plainly distinguishes between types of solicitations on its face. Whether the Ordinance is violated turns solely on the nature or content of the solicitor's speech: it prohibits solicitations that request immediate donations of things of value, while allowing other types of solicitations, such as those that request future donations, or those that request things which may have no "value"—a signature or a kind word, perhaps.

But we do not end our inquiry there. Having determined that the Ordinance's speech restriction is based on a content distinction, our pragmatic approach asks next whether the City "has distinguished [speech] *because* of its content," and is consequently content-based. *Brown*, slip op. at 15. In our recent decision in *Brown*, faced with the "distinctive problems" posed by municipal sign ordinances, we applied this pragmatic inquiry and declined to find a censorial purpose. *See id.* However, *Brown* reviewed the constitutionality of a different kind of expressive activity at a different procedural posture, when more facts were at play and evidence could be evaluated. In contrast, here we are bound—like the district court—to evaluate Appellants' claims based on the sufficiency of their pleadings, not based on the government's asserted evidence or our own independent judgment of likely purposes. We find ourselves ill-equipped to reach a conclusion as to censorial purpose, based on the record before us, at this juncture. We are compelled to conclude that the district court erred in finding the Ordinance content-neutral as a matter of law and dismissing the case on a Rule 12(b)(6) motion to dismiss.

2.

Deeming the Ordinance a constitutional, content-neutral time, place, and manner regulation, the district court reasoned that "the restrictions at issue in the instant case are limited to 'situations in which people most likely would feel a heightened sense of fear or alarm, or might wish especially to be left alone.'" *Clatterbuck*, 841 F. Supp. 2d at 951 (quoting *Gresham v. Peterson*, 225 F.3d 899, 906 (7th Cir. 2000)). Although the district court purported to reach its conclusion "on the face of the ordinance," it indicated in a footnote its reliance on video archives of the Charlottesville City Council meetings on August 2 and 16, 2010, which the City referenced in its reply brief in support of its motion to dismiss. *Id.* at 952 n.7. Stating that the archives "are a matter of public record available for viewing at www.charlottesville.org," the district court summarized the information "disclosed" during these meetings as follows: "[T]he 50-foot buffer zone in the vehicular crossings was proposed as 'absolutely crucial for the safety and security' of Mall patrons because pedestrians were being 'distracted' in and near the crossings." *Id.*[3] In considering these statements as evidence supporting the government's non-censorial purpose, the district court erred by impermissibly reaching outside the pleadings to make findings of fact.

Ordinarily, a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, on a motion to dismiss. *Braun v. Maynard*, 652 F.3d 557, 559 n.1 (4th Cir. 2011). Rule 12(d) specifies:

> If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as

---

[3]We omit the remaining portion of the district court's lengthy summary of the city council meetings, because it pertains to the Ordinance's restrictions around outdoor cafes and vendors, not relevant to this appeal.

one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

Fed. R. Civ. P. 12(d). Here, although the district court considered—and relied on—the extrinsic evidence offered by the City along with its reply brief, it did not convert the City's motion into one for summary judgment.

Nevertheless, the City argues that the district court's consideration of the city council meeting archives was proper because those meetings are public records. This argument relies on a narrow exception to the principle embodied in Rule 12(d) that allows a court to consider facts and documents subject to judicial notice without converting the motion into one for summary judgment. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir. 2011). Under this exception, courts may consider "relevant facts obtained from the public record," so long as these facts are construed in the light most favorable to the plaintiff along with the well-pleaded allegations of the complaint. *B.H. Papsan v. Allain*, 478 U.S. 265, 283 (1986). The information considered by the district court here was neither a "fact," nor was it construed in the light most favorable to Appellants.

In some circumstances, the government's purpose as stated in a legislative record may constitute a fact obtained from public record and subject to judicial notice. For example, in *Anheuser-Busch, Inc. v. Schmoke*, 63 F.3d 1305, 1312 (4th Cir. 1995), *judgment vacated on other grounds*, 517 U.S. 1206 (1996), *readopted*, 101 F.3d 325 (4th Cir. 1996), *cert. denied*, 520 U.S. 1204 (1997), we reviewed the propriety of considering on a motion to dismiss the legislative history of an ordinance, including a transcript of hearings before the city council and four studies that the city council considered as support for the ordinance. There, we concluded that the ordinance itself and its legislative history were "'legislative facts,'

the substance of which cannot be trumped" upon judicial review, and are "not a matter beyond the pleadings but . . . an adjunct to the ordinance which may be considered by the court as a matter of law" in the context of a First Amendment challenge. *Id.*

The narrow exception applied in *Anheuser-Busch* does not, however, grant the district court carte blanche to label any information a "legislative fact" merely because it was gar-nered from the public record associated with the enactment of an ordinance. The district court here quoted a citizen speaking at a city council meeting in support of the proposed ordinance,[4] apparently treating that statement as a fact of legislative pur-pose. In this context, the opinion of an individual citizen about an ordinance does not qualify as a fact of public record proper for judicial notice. This is particularly so given the requirement that facts be construed in the light most favorable to the Appellants here.

Further, whether information is the proper subject of judi-cial notice depends on the use to which it is put. *Cf. United States v. Bello*, 194 F.3d 18, 22 (1st Cir. 1999) (stating that the propriety of the district court's decision to take judicial notice "depends not on the nature of the fact . . . but rather on the use made of it . . . and the same fact can play either role depending on context"). The district court used the video archives as evidence of the Ordinance's content-neutrality, relying on that evidence to conclude that the Ordinance was necessary, according to the City, for the safety and security of

---

[4]In the sections cited by the City, three people spoke as concerned citi-zens, two in support of restricting "panhandling" around streets with vehicular traffic, and one—Jeffrey Fogel, now an attorney of record for Appellants cooperating with the ACLU—vehemently opposed to the Ordi-nance, which he described as an attack on impoverished people in the Downtown Mall that he predicted will be enforced only against poor peo-ple. *See* 8/2/2010 meeting at 34:00-37:09, 1:35:06-1:49:35; 8/16/2010 meeting at 1:34:00-1:38:27, 2:07:53-2:12:03 (video archive available at www.charlottesville.org).

individuals on the Mall. At the pleadings stage, at least, this was error. *See Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006). On a motion pursuant to Rule 12(b)(6), the court's task is to test the legal feasibility of the complaint without weighing the evidence that might be offered to support or contradict it. It is this task to which we now return.

3.

Construing the facts contained in the pleadings in the light most favorable to Appellants, as we must, the complaint plausibly alleges that the City enacted the Ordinance with a censorial purpose and in violation of the First Amendment.

The Ordinance does not contain a statement of purpose, and no evidence is properly before us to indicate the City's reason or reasons for enacting the Ordinance. To be sure, the City has advanced some plausible arguments that it enacted the Ordinance without any censorial purpose and with a compelling, content-neutral justification. These rationales additionally find support in First Amendment jurisprudence. *See, e.g.*, *United States v. Kokinda*, 497 U.S. 720, 733-34 (1990) ("Solicitation impedes the normal flow of traffic. Solicitation requires action by those who would respond: The individual solicited must decide whether or not to contribute (which itself might involve reading the solicitor's literature or hearing his pitch), and then, having decided to do so, reach for a wallet, search it for money, write a check, or produce a credit card." (internal citations omitted)); *Gresham*, 225 F.3d at 906 ("The city has a legitimate interest in promoting the safety and convenience of its citizens on public streets.").

Without any facts before us pertaining to the government's reasons for enacting the Ordinance, however, forming conclusions about these asserted purposes becomes mere conjecture. Indeed, in the cases just cited, and many others proffered by the City to support content-neutrality, the government's justi-

fication for the regulation was established in the record, and the court was able to weigh evidence supporting that justification. *See, e.g.*, *Gresham*, 225 F.3d at 906 ("The city determined that vocal requests for money create a threatening environment or at least a nuisance for some citizens."). Likewise, in *Brown*, we found at the summary judgment stage that a sign regulation, which distinguished speech based on its content, was content-neutral where its "exemptions reasonably advance the legislative interests of traffic safety and aesthetics," slip op. at 15, and the government "adequately documented its aesthetic concerns," *id.* at 17. There we relied on legislative findings (the regulation's preamble, policy statements, and testimony of government officials) that "unregulated signage would depress property values, cause visual blight, deter commercial and residential growth, harm environmental resources, and diminish the wholesome character of the Town," and our own finding based on the record that the appellee's actions in violating the regulation (spraying bright fluorescent lettering across the side of his home) implicated safety concerns because both a police officer and passing motorist had been distracted. *Id.* No such findings or evidentiary record exist here.

Because we cannot determine the City's purpose in enacting the Ordinance or assess the strength of its underlying concerns, we cannot be sure of a reasonable fit between the content distinction made in the Ordinance—singling out requests for *immediate* donations—and the City's justification for that distinction. *Cf. Ward*, 491 U.S. at 791; *Wag More Dogs*, 680 F.3d at 366; *Brown*, slip op. at 14-15. Accordingly, we cannot accept the district court's conclusion that the Ordinance does not distinguish protected speech because of the message it conveys.

Beyond our inability to determine that the Ordinance is content-neutral, without evidence about the City's purpose we are further unable to weigh how compelling the City's interest is, nor whether the Ordinance is narrowly tailored to that

interest. Similarly, without any evidence in the record about the Downtown Mall itself, we have no way of determining that the Ordinance leaves open ample alternative means of communication.

We are unable at this point to accept the City's possible justifications over the plausible censorial purpose alleged by Appellants: that the City enacted the Ordinance to reduce the presence of impoverished people on the Downtown Mall. In contrast to *Wag More Dogs*, in which we affirmed the dismissal of a First Amendment claim on the pleadings where the plaintiff "ha[d] not alleged—nor could it—that [the government] regulated speech through the [ordinance] because of disagreement with the message it conveys," 680 F.3d at 368 (internal quotation marks omitted), here Appellants have specifically alleged that the City intended to prevent their undesired presence on the Mall—in other words, that the regulation exists to prevent Appellants from conveying their unwanted message. *Cf. Loper*, 999 F.2d at 704 ("Begging frequently is accompanied by speech indicating the need for food, shelter, clothing, medical care or transportation. Even without particularized speech, however, the presence of an unkempt and disheveled person holding out his or her hand or a cup to receive a donation itself conveys a message of need for support and assistance.").

It is not implausible that the City singled out requests for immediate donations in an attempt to target the particular nuisance of beggars' speech but allow other types of solicitation to continue. We find Appellants' allegation a reasonable one, and must accept it as true at this stage. *See Aziz v. Alcolac*, 658 F.3d at 390. Thus, we find that Appellants have nudged their claim that the City enacted a content-based regulation, which is not the least restrictive means of furthering a compelling government interest, across the line from conceivable to plausible. *See Wag More Dogs*, 680 F.3d at 365; *Twombly*, 550 U.S. at 570.

### III.

For the reasons set forth herein, the judgment below is

*REVERSED AND REMANDED.*